COOLICAN, Respondent, vs. THE MILWAUKEE & SAULT STE. MARIE IMPROVEMENT COMPANY, Appellant.

*March 21 — April 9, 1891.*

*Broker's commissions: Evidence: Instructions: Questions for jury.*

1. Where, in an action to recover commission on a sale of real estate made by the plaintiff, it appeared that, in answer to a letter from defendant's manager proposing to employ him to conduct a sale of land, the plaintiff wrote him saying: "Regarding terms. I would be willing to put in three weeks, or longer if necessary, as follows: ten per cent. commission on all *bona fide* sales, no charge for bogus sales, cappers, or lecturing, and $10 per day from date of engagement until finished," and the defendant having accepted the terms by letter, the plaintiff made both auction and private sales, and finally the balance of the property was sold to C., the defendant's general manager, on which latter sale the plaintiff claimed commission,— *held,* that the questions whether the plaintiff made the latter sale, and was entitled to commission thereon, and whether there had

Coolican vs. The Milwaukee & Sault Ste. Marie Imp. Co.

been a settlement between the parties as to his commissions, were proper questions for a jury.

2. To refuse to submit to the jury questions which were substantially covered by those which were submitted, is not error.

3. To exclude evidence that the general manager had not paid for the property bought by him; or evidence of what occurred at a meeting of the company after the plaintiff commenced his labors, in respect to their intention that he should sell only at auction, which was never communicated to him, was not error.

4. It was proper for the court to refuse to give a long general charge, and to confine his instructions to such matters as were necessary to enable the jury to answer the questions submitted to them.

5. It was not error for the court, in giving an instruction as to the kind of sales on which the plaintiff was to have commissions, to say that "as there are different kinds of sales of land, and as the contract does not specify the kind, it is for the jury to determine from the evidence and the letters forming the contract and the attendant circumstances, as to whether it included only auction sales, or both auction and private sales, for which plaintiff was to receive commissions."

6. Where the evidence was conflicting, but there is enough to sustain the verdict, and the trial judge has refused to set it aside and grant a new trial, the judgment will be affirmed on appeal.

APPEAL from the Superior Court of *Milwaukee* County. The case is very fully stated in the opinion. The defendants appeal from a judgment for the plaintiff.

The cause was submitted for the appellants on the brief of *Burke & Hiles*. They contended, among other things, that, inasmuch as the general manager was by the articles of incorporation of the company, of which, being of record, the plaintiff was bound to take notice, to be at all times subject to the orders of the board of directors, the court should have admitted evidence of what that board understood to be the contract with the plaintiff. The defendant was entitled to have all the material and issuable questions involved in the case presented by the special verdict, and the court should have submitted those proposed by it. *Johnson v. Ashland L. Co.* 47 Wis. 326; *Hutchinson v. C. & N. W. R. Co.* 41 id. 541; *Jung v. Stevens Point*, 74 id.

547. It should also have given the instructions asked by the defendant, not covered by those given.

For the respondent the cause was submitted on the brief of *Williams & May.*

TAYLOR, J. This action was brought by the respondent to recover a balance claimed to be due to him from the appellant company for services and commissions for the sale of certain lots and real estate owned by the company. There were but two questions at issue between the parties on the trial of the action.

The first question litigated was as to provisions of the contract between the plaintiff and the company. The plaintiff claimed that, under the contract existing between the parties, he was engaged to sell out the property of the defendant situated in Sault Ste. Marie, Mich., which consisted of 472 city lots, and that he was to be paid $10 per day and ten per cent. commission upon all *bona fide* sales made, whether the same were sold at public auction or at private sale. The defendant contended that, under the contract, the plaintiff was simply employed as an auctioneer, and that he was to be paid $10 per day and ten per cent. on all *bona fide* sales made at public auction only.

The second question litigated was whether, after all sales were made and the defendant's employment had ceased, there had been a settlement and accounting between the parties, and the amount found due the plaintiff had been fixed and agreed upon by the parties, and such amount, so fixed and agreed upon, had been paid by the defendant and accepted by the plaintiff, except the sum of about $70, which defendant admitted it owed the plaintiff.

The question as to what the contract in fact was depended, to a great extent, upon the correspondence in regard to that matter between the plaintiff and the general manager of the defendant, Mr. Cameron. That correspondence

was in evidence. The proposition made by the plaintiff, and which was accepted by the general manager of the defendant, with the approval of the other officers of the corporation, was as follows:

"TOLEDO, OHIO, 15th Feb., 1888.

"*J. D. Cameron, Esq., S. Ste. Marie, Mich.*— Dear Sir: Your favor 8th, with plan inclosed, only reached me to-day. I was in Detroit when it was forwarded here, and it has been following me around since. You must excuse writing, as I have just drove in from Maumee, 11:20 P. M., and my hands are just frozen. In Milwaukee, I think, you have a good field, but it will require more working than you anticipate. I am afraid your programme would not be successful. You must work the city press, and get the confidence of the people, or all will go flat. I have had a good experience of selling Soo·property in Detroit, and it will prove a case of ' hit or miss,' just how it is handled. Don't do a thing until you get there yourself, or you will surely give the whole scheme a black eye. The ' public ' is a queer animal to handle, and you must just catch him right. Now, regarding my handling your sale, I might be able to give you three or four weeks, but I don't know how I can spare time from Maumee. Things are looking elegant there now. I would like to go to Milwaukee first rate, and know, with what advertising we have done for the Soo, whilst in Detroit and here, that I would rely on a successful sale. In fact, I am sure that you will do well there if you run things properly. Regarding terms, I would be willing to put in, say three weeks, or longer, if necessary, as follows: Ten per cent. commission on all *bona fide* sales, no charge for bogus sales, cappers, or lecturing, and $10 per day from date of engagement until finish. The object of the $10 is for expenses which I would necessarily incur working the press boys and doing general booming work. It cost me more than that in Detroit. That would be at the rate of $300

per month, and I would be willing to take my chances on commission on sales to make the trip pay me. If it is a success for you, it will be for me; if not, I want no other payment. I am pretty well posted in 'Soo' matters, and think I can do you justice. If you should care to have me with you, wire me at your earliest, care Wayne Hotel, Detroit. Watson is sitting here with me, and sends his regards, and hopes to see you soon. Regards to Leiter and other Sooites who may remember me.

"Yours, very truly,     J. S. COOLICAN."

To this letter Cameron replied as follows:

"SAULT STE. MARIE, MICH., March 7, 1888.

"*J. S. Coolican, Esq., Wayne Hotel, Detroit, Mich.*— Dear Sir: I received inclosed telegram from Legg & Thornburg, president and vice-president of the company. I personally own ⅛ interest in the property we propose to sell, viz.; the Milwaukee Syndicate addition. As to the terms, we will pay you, as suggested, 10 per cent. commission and $10.00 per day; commission to be on actual sales made. We want to close all the property out in lots of 10 or more. Prefer to sell even at a smaller price if can close out all soon and in quantities. I will telegraph you from Milwaukee when to come. Yours resp't,     JOHN D. CAMERON,

"Manager Milwaukee & Sault Ste. Marie
Improvement Co."

In addition to these letters the plaintiff introduced a telegram from Legg & Thornburg to John D. Cameron, as follows:

"CLINTON, IOWA, March 3, 1888.

"*To John D. Cameron:* If you think best, get *Coolican* to help in Milwaukee. Answer.     LEGG & THORNBURG."

This telegram was inclosed to the plaintiff in Cameron's letter to him of March 7, 1888.

Upon the strength of this correspondence the plaintiff came to Milwaukee and entered upon the sale of said lots

of the improvement company, with the knowledge and consent of the members of the company. Auction sales were held from time to time in Milwaukee, and some sales were made at private sale down to about the 3d or 4th of May, 1888. When about 207 lots of the 472 had been sold, either at auction or private sale, and on the 4th of May, 1888, Cameron made the company an offer to take all the lots not then sold at $100 each, and this offer was accepted by the company on the 5th of May, and the lots were afterwards deeded to the said Cameron by the company, the consideration being $26,500. The real and only contention between the parties is as to the right of the plaintiff to ten per cent. commission on this sale made to Cameron. All other matters have been adjusted by the parties.

On the part of the plaintiff it is claimed that the sale to Cameron was brought about mainly through the influence of the plaintiff, and that without his influence the sale would not have been made. On the part of the defendant it is contended that the employment of the plaintiff, under his contract, had ceased, and he had been discharged before such sale was made, and it is also claimed by it that it was expressly understood and agreed at the time such sale was made to Cameron that no commission on that sale should be paid to the plaintiff thereon, and that he assented thereto. It is also insisted by the defendant that under his contract of employment he was not in any event entitled to receive commissions on that sale. It is also contended by the defendant that, if the sale to Cameron is to be considered a sale under plaintiff's contract, on which he was entitled to commission, the whole matter was adjusted and settled by the parties, and an account rendered and stated by the plaintiff fixing the amount due him from the defendant, and that in such account rendered and stated no claim was made for commissions on that sale, and that he is now

estopped from claiming the same by reason of such settlement.

The case was tried by a jury, and under the direction of the court a special verdict was rendered. The following is the special verdict as rendered by the jury: "1. Did plaintiff enter into defendant's employ on or about March 7, 1888? Answer by consent. Yes. 2. Was plaintiff employed by defendant as an auctioneer solely? A. No. 3. Was plaintiff to receive ten per cent. commission upon all actual sales made, whether made by auction or privately, under his contract of employment? A. Yes. 4. If you answer the third interrogatory in the negative, state for what kind of sales the plaintiff was to receive commission. A. ———. 5. If you answer the third question in the affirmative, did the plaintiff settle with defendant, waiving his claim for commissions upon the sale made to John D. Cameron? A. No. 6. Did plaintiff and defendant have a settlement and accounting between themselves, and, if they did so, at what time? A. No. 7. If you answer the last question in the affirmative, did such settlement become an account stated, and, if so, for what amount? A. ———. 8. If you answer the seventh question in the affirmative, did such accounting include the claim of plaintiff to receive commissions on sale to John D. Cameron? A. ———. 9. At what time did defendant agree to sell the 265 lots to John D. Cameron? A. May 5th. 10. Is plaintiff entitled to recover commissions on sale to John D. Cameron. A. Yes. 11. If you answer the last question in the negative, how much is plaintiff entitled to recover? A. Including interest and principal, $3,073.87."

After the receipt of the verdict a motion was made by the defendant to set the same aside, and for a new trial, for reasons stated, which were the same assigned for error in this court. The trial court refused to set aside the verdict, and rendered judgment in favor of the plaintiff for the

Coolican vs. The Milwaukee & Sault Ste. Marie Imp. Co.

amount found due the plaintiff by the verdict, and the defendant appeals to this court, and assigns as errors the following, viz.:. " (1) That the court erred in its admission and exclusion of evidence upon the trial of said case. (2) That the court erred in refusing to submit to the jury the questions asked for and proposed by the defendant upon the trial as and for a special verdict, and in submitting to the jury the questions which it did submit. (3) The court erred in refusing the instructions asked for by defendant, and giving the instructions which it did. (4) The court erred in entering judgment in plaintiff's favor on the special verdict of the jury. (5) The court erred in its refusal to set aside the special verdict of the jury and grant a new trial of the action. (6) The court erred in not granting the defendant's motion for a nonsuit."

The counsel for the appellant claim that certain evidence offered by the defendant to show that the notes given by Cameron, and secured by mortgage upon the lots sold to him, had not been paid, and that he had not paid the taxes on the property. This was excluded by the court as irrelevant and immaterial, and we are at a loss to understand how that fact was material to the defense. It was concerning a matter not in any way connected with the plaintiff, and in no way tends to disprove that the defendant was to pay commissions on the sale of its lots to Cameron. All parties seem to have considered Cameron a responsible man at the time, and the sale to him seems to have been considered by the appellant a safe one for it, as by it he released all claims to any part of the $29,000 due or to become due on the sale of the 207 lots theretofore sold, and his notes and mortgage to secure the balance due on the 265 lots sold to him amounted to less than $70 per lot; and it is fair to suppose that the officers of the corporation considered this sale a good and safe sale at the time it was made. That it may have afterwards turned out a bad sale, or a sale upon

unsafe security, cannot affect the plaintiff's right to his commissions, if he was entitled to them under his contract.

It is also insisted that it was error for the court to exclude evidence of what took place at an alleged meeting of the company, after the plaintiff had been employed and had commenced his labors, as tending to show that the company only intended him to sell at auction, and that he was subject to be discharged by it at any time. There was no offer to show that what was said or done at such meeting was ever in any way communicated to the plaintiff. Clearly that evidence was incompetent to change or modify the contract made by the correspondence between the parties. After a careful reading of the whole evidence, we think it quite clear that the officers of the company knew of the correspondence between Cameron and the plaintiff as to his employment, and that they must be held to the contract made by the correspondence, when construed in the light of all the evidence in the case, and that no determination of the corporation not communicated to the plaintiff could change such contract.

In reading the record it appears to me that the court was very liberal in allowing the defendant to introduce its testimony, and that it cannot, with any show of right, claim that it was injured by the rejection of any competent evidence offered by it.

The objection that the court erred in rejecting the questions offered by the defendant for a special verdict, and in submitting the questions which constitute the special verdict in the case, it seems to us, is without merit. As said above, the only issues in the case which were litigated were: First, as to what the contract between the parties was, the plaintiff claiming that he was to have commissions upon all *bona fide* sales made, whether made at public auction or private sale, and the defendant claiming he was only to have commissions upon sales at auction. The sec-

ond and third questions submitted to the jury covered this issue fully. The second issue was upon the question of settlement between the plaintiff and the defendant for all his services on its behalf. This issue was covered by questions 5 and 6 of the special verdict.

It is possible that, under the evidence in the case, it would have been proper, if it had been requested by either party, to have submitted the question to the jury whether the plaintiff had been discharged from the service of the defendant before the sale to Cameron was made, as there was some evidence in the case tending to establish that fact; but neither party seems to have desired or requested the submission of that question. The defendant did not propound any such question in the special verdict offered by it, or any equivalent one, nor does it appear that it requested its insertion in the verdict submitted by the court. The tenth question in the special verdict is general enough to cover that view of the case. The question is: " Is plaintiff entitled to recover commissions on the sale to John D. Cameron?" If the employment of the plaintiff with the defendant had ceased before that sale was made, it would have been proper for the court to instruct the jury that he was not entitled to commissions on such sale.

The learned counsel for the appellant allege as error, that the court refused to give the instructions asked by it. The instructions asked were a general charge to the jury upon the whole case, as they cover six and a half pages of the printed case. The court declined to give the charge as asked by the defendant, and the exceptions are of as general a character as the charge. We think the learned judge committed no error in refusing this general charge. The jury were called upon to answer specific questions, and the court had the right, in his discretion, to confine his instructions to such matters as were necessary to enable the jury to answer the questions propounded to them, intelligently

and in accordance with the evidence and the law applicable to each. This the learned judge did in submitting the questions to the jury for their answers.

Some exceptions were taken to the instructions given by the court to the jury. In submitting the second and third questions of the special verdict, which present one of the material issues, the learned judge instructed the jury as follows: "I will instruct you upon these two questions together. This employment was made by correspondence, which has been read to you, and which you will be allowed, by consent of the parties, to take with you to the jury-room. In the letters, which make a contract in writing, it is provided that plaintiff is to have ten per cent. commission on all actual sales made; but as there are different kinds of sales,— sales by auction and sales not by auction, private sales,— and as the written contract does not specify the kind of sales for which the ten per cent. commission was to be paid, the court has come to the conclusion that it is the province of the jury to determine the meaning of this contract on this point from all the evidence in the case. In coming to the conclusion in this matter you will take into consideration the letters forming the written contract in this case, and you will give to them, and to each sentence and word therein, the weight and consideration which they deserve. Consider their relation to each other, and to the subject-matter in dispute; the business of the plaintiff; the object that defendant had in employing the plaintiff; the kind of property sold. You will consider these letters in connection with all the rest of the evidence in the case,— the situation, condition, and business of the parties, subject-matter of the action,— in order to determine the true meaning of this contract, and the real understanding of the parties when this contract was made. Then you have the right to consider the practical constructions of this contract by the plaintiff and defendant after the performance of this con-

tract was begun.   Did the parties themselves construe this
contract as meaning auction sales, or did they construe it as
meaning both auction sales and private sales?   Take into con-
sideration all that the parties did in reference to this contract,
and all their acts which may tend to throw a light upon the
kind of sales for which plaintiff was to receive commission.
And you must keep in mind the written contract when
you consider the oral testimony, and must keep in mind
the oral testimony when you consider the writings.   In
short you must consider all the testimony, all the facts, the
situation of the parties, everything that there is in the
case, in making up your minds upon this question; and you
will fairly and dispassionately weigh all the evidence in this
case when you consider this question."  .

This instruction, it seems to us, was sufficiently favorable
to the defendant, and no exception was taken to any of the
material parts of it.   We have examined the instructions
given upon the question submitting the question of settle-
ment between the parties, and find nothing prejudicial to
the defendant.   The record discloses numerous exceptions
taken to detached parts and sentences of the instructions,
but on the argument of the case in this court the learned
counsel for the appellant have not called the attention of
the court to any particular exceptions which they deem
well taken, and which, they claim, were prejudicial to the
rights of the defendant.   We think we are authorized to
understand, therefore, that the defendant does not rely
upon these exceptions for a reversal of the judgment.   We
have carefully read the instructions given by the learned
trial judge to the jury, and think that he submitted the
questions fairly to the jury, and that the defendant was not
prejudiced by such instructions.

It is urged by the learned counsel for the appellant that
the court erred in entering judgment in favor of the plaint-
iff upon the special verdict, and in refusing to set aside

such verdict, and granting a new trial, and in refusing to nonsuit the plaintiff on defendant's motion. These propositions are commented on by the learned counsel for appellant as substantially the same, and they claim that the court erred in refusing them, because, upon the whole evidence, the verdict and judgment are wholly unsupported by the evidence.

After reading the evidence in the record carefully and at length, it is evident that there was a decided conflict in the testimony, and it leaves the mind in considerable doubt as to what the real rights of the parties to the action are. The record creates the doubts, not because there is not evidence enough in the record to sustain the verdict and judgment, but because the evidence of the defendant is so contradictory to that of the plaintiff as to create doubts as to the truth of the plaintiff's testimony. It is clearly a case in which a jury must determine the rights of the parties upon all the evidence, and not a case for the court to interfere and determine that the testimony of the one party shall prevail over that of the other; and as the learned trial judge, who heard all the evidence and saw most of the witnesses who gave the testimony, refused to set aside the verdict and grant a new trial, this court cannot rightfully do so. Upon the record in this case it is quite clear that the verdict of the jury, either in favor of the plaintiff or in favor of the defendant, upon the real issues in the case, must necessarily be sustained by the court.

*By the Court.*— The judgment of the superior court of Milwaukee is affirmed.